UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION


DEREK BURKS,

        Petitioner,

                                      Case Number 15-cv-10649

v.

                                      Honorable Thomas L. Ludington

KENNETH MCKEE,

        Respondent.

_____/

## OPINION AND ORDER DENYING THE HABEAS CORPUS PETITION, DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY, AND GRANTING LEAVE TO APPEAL IN FORMA PAUPERIS

Petitioner Derek Burks, a state prisoner presently confined at the Kinross Correctional Facility in Kincheloe, Michigan,[1] has filed a *pro se* application for the writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner was convicted in Wayne County, Michigan of assault with intent to commit armed robbery, Mich. Comp. Laws § 750.89, felonious assault, Mich. Comp. Laws § 750.82, felon in possession of a firearm, Mich. Comp. Laws § 750.224f, and possession of a firearm during the commission of a felony, second offense, Mich. Comp. Laws § 750.227b. The trial court sentenced Petitioner as a habitual offender, fourth offense, to five years in prison for the felony-firearm conviction, followed by concurrent sentences of twenty to forty years in prison for the assault-with-intent-to-commit-armed-robbery conviction, two to four years in prison for the felonious-assault conviction, and three to five years in prison for the felon-

_____

[1] Petitioner was confined at the Bellamy Creek Correctional Facility in Ionia, Michigan when he filed his petition. He subsequently informed the Court that he was transferred to the Thumb Correctional Facility in Lapeer, Michigan. *See* ECF No. 7. Records maintained by the Michigan Department of Corrections on its official website indicate that Petitioner currently is confined at the Kinross Correctional Facility. *See* http://mdocweb.state.mi.us/OTIS2/otis2profile.aspx?mdocNumber=317983.

in-possession conviction. In his habeas petition, Petitioner raises one claim about the prosecuting attorney in his case and four claims about his trial attorney. Respondent Kenneth McKee urges the Court through counsel to deny the petition on the basis that the state courts' rejection of Petitioner's claims did not result in decisions that were contrary to federal law, unreasonable applications of federal law, or unreasonable determinations of the facts. Because the Court agrees that Petitioner's claims do not warrant habeas relief, the petition will be denied.

## I.

Petitioner was tried before a jury in Wayne County Circuit Court, where Domenico Policchio testified that, on February 19, 2011, at about 10:30 p.m., he was drinking coffee in the back room of his pizza business on Michigan Avenue in Detroit. He was standing fifteen to eighteen feet away from the front door when he heard the door open. He saw a light-complected black man approach his employee with a gun. The armed man said, "Give me your money.  I know you got it, I know you got it.  Give me your money or I'm going to kill." He (Policchio) went to the back of his business to get a gun, but then he heard several gunshots. He did not see anything more, and his employee was unharmed. On February 23, 2011, some police officers showed him six photographs. He informed the police that the person in the first photo was the person who had come into his pizzeria on February 19, 2011. At trial, Mr. Policchio identified Petitioner as the armed man who came into his business on February 19, 2011, and demanded money.  8/10/11 Trial Tr. at 7–16, ECF No. 6-8, Page ID 304–313.

Arnulfo Flores testified that he was working behind the counter of the pizzeria about 10:00 or 10:30 p.m. on February 19, 2011, when an armed man walked in the door and pointed a silver automatic handgun at him. The man came to the counter and said, "Give me your money, give me your money. I know you got money, or I'm going to kill you." When the man went to

the side of the counter near the west wall of the building, Mr. Flores pulled his semi-automatic gun from his pocket and fired all eight shots at the man. The man fled the pizzeria and headed east on Michigan Avenue. On February 23, 2011, police officers showed Mr. Flores six black and white photos, but he was unable to identify anyone. He mentioned the man in position number four because that man was light-complected, but he was not sure about his choice at the time. At the preliminary examination, however, he identified Petitioner because Petitioner's face looked just like the man he had seen in the pizzeria. *Id*. at 33–43, Page ID 330–40. Mr. Flores also identified Petitioner at trial. *Id*. at 41, Page ID 338.

Detroit Police Officer Lillie Drake testified that she prepared and conducted the photo line-up in Petitioner's case. Petitioner's photo was number one in the array. Mr. Policchio identified someone in the array, but Mr. Flores did not. Officer Drake also was present when a buccal swab was taken from Petitioner. *Id.* at 52–56, Page ID 349–53.

Detroit Police Officer Donald Covington was the first officer to arrive at the crime scene. He spoke with Arnulfo Flores and took a .32 caliber Beretta semi-automatic gun from Mr. Flores. The owner of the pizzeria indicated to him that he caught only a glimpse of the man who had entered his business that night. The suspect was described as a light-complected black male who was in his mid-twenties and wore a goatee. When the Dearborn police notified the Detroit Police that a suspect matching this description was at Oakwood Hospital, an officer in another scout car was directed to the hospital. *Id*. at 56–63, Page ID 353–60.

Detroit Police Officer Stephen Petroff was in the back-up unit that responded to the pizzeria on February 19, 2011. About 10:50 p.m. that night, officers received a call indicating that an injured person was at Oakwood Hospital. Officer Petroff went to the hospital and was

directed to the emergency room where he saw Petitioner, who had been shot in the chest, stomach, and thigh. *Id*. at 66–69, Page ID 363–66.

Officer Raymond Diaz was working as an evidence technician for the Detroit Police Department on February 19, 2011. He found four .32 caliber casings at the crime scene. He also saw two fired bullets, suspected bullet holes on the west wall, suspected blood on the wall of the pizzeria, and suspected blood on the street. He collected blood samples from the west wall and from the trail of blood outside. *Id*. at 70–81, Page ID 367–78.

Forensic scientist Brandon Good testified that three items of evidence were submitted to the Michigan Department of State Police for analysis: one was a known DNA sample from Petitioner, another one was a blood swab taken from outside the pizzeria, and the third one was taken from the west wall of the pizzeria. He determined that the bloodstain taken from the west wall matched Petitioner's DNA profile and that the blood stain collected from the street generated a partial profile, which matched Petitioner's DNA profile. *Id.* at 84–96, Page ID 381–93.

Petitioner did not testify, but he called two Detroit police officers to testify in his defense. Officer Adrian Lawrence testified that, on February 19, 2011, he was working in the homicide section of the police department where he was informed by officers at the crime scene that there was an attempted armed robbery at the pizzeria on Michigan Avenue. He received additional information that Mr. Flores had shot somebody in the chest, stomach, and leg and that the assailant ran out of the pizzeria and jumped into a white truck. Subsequently, the Dearborn Police advised Detroit police officers that there was a shooting victim at Oakwood Hospital, and Officer Covington informed Officer Lawrence that the person at the hospital was the suspect from the pizzeria. Officer Lawrence did not know how the officers at the scene were able to

confirm that the shooting victim at the hospital was the same person as the suspect in the attempted robbery at the pizzeria. 8/11/11 Trial Tr. at 10–23, ECF No. 6-9, Page ID 412–25.

The second and final defense witness was Officer Raymond Sturley who testified that, approximately six days after the incident at the pizzeria, he went to 2352 17th Street to check a green 1997 Buick LaSabre, which was registered to Petitioner. The vehicle was located about a mile and a half from Bona's Pizzeria on Michigan Avenue. There was blood on the driver's seat, but he was unable to do a complete inventory search because the vehicle was locked. He impounded the car because there was blood on the seat, but to the best of his knowledge, no one recovered any evidence from the vehicle. *Id*. at 24-35, Page ID 426-37.

During closing arguments, the prosecutor maintained that the evidence of Petitioner's guilt was overwhelming. Defense counsel argued to the jury that the issue was one of identity, that the prosecution's identification evidence was flawed, and that there was reason to doubt where the police found Petitioner's DNA. At the conclusion of defense counsel's closing argument, Petitioner got up from his seat and said, "I'm sorry, it's my life! This is my life. . . . I got a bullet in my back that he won't take out." His brother added, "The bullet will prove he's innocent. There's a bullet right here that don't go to that man's gun. I promise you!" *Id*. at 58, Page ID 460.

The prosecutor then gave his rebuttal argument and informed the jury that Petitioner's emotional outburst was not evidence. *Id*. at 60–62, Page ID 462–64. The trial court's charge to the jury followed.

On the following day, August 12, 2011, the jury found Petitioner guilty, as charged, of assault with intent to commit armed robbery, felonious assault, felon in possession, and felony firearm. The trial court subsequently sentenced Petitioner as a habitual offender to five years in

prison for the felony-firearm conviction, followed by concurrent prison terms of twenty to forty years for the conviction for assault with intent to commit armed robbery, two to four years for the felonious assault conviction, and three to five years for the felon-in-possession conviction.

Petitioner appealed his convictions through counsel and then requested a remand so that he could seek a new trial on the basis of newly discovered evidence and a claim of ineffective assistance of trial counsel. The Michigan Court of Appeals granted Petitioner's motion for a remand, but the trial court denied Petitioner's motion for new trial upon remand. *See People v. Burks*, No. 11-002411-01, Op. and Order Denying Defendant's Mot. for a New Trial (Wayne Cty. Cir. Ct June 3, 2012), ECF No. 6-13, Page ID 930-37. The Michigan Court of Appeals subsequently affirmed Petitioner's convictions in an unpublished decision. *See People v. Burks*, No. 306588, 2013 WL 1500976 (Mich. Ct. App. Apr. 11, 2013). On November 25, 2013, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues. *See People v. Burks*, 839 N.W.2d 221 (Mich. 2013) (table).

Petitioner filed his habeas petition on February 19, 2015. He alleges in his first ground for relief that he was denied due process and a fair trial by the prosecutor's failure to disclose the search warrant for Petitioner's vehicle. His remaining four claims allege that his trial attorney was ineffective for failing to (1) request a hearing for the purpose of challenging the eyewitnesses' in-court identifications of him, (2) seek discovery of any and all search warrants executed by the police during their investigation, (3) present exculpatory witnesses at trial, and (4) move to adjourn the trial so that a bullet could be removed from Petitioner's back.

## II.

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death

Penalty Act of 1996 (AEDPA)." *Harrington v. Richter*, 562 U.S. 86, 97 (2011). Pursuant to §

2254, the Court may not grant a state prisoner's application for the writ of habeas corpus unless

the state court's adjudication of the prisoner's claims on the merits

> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[A] federal habeas court may not issue the writ simply because that court concludes in

its independent judgment that the relevant state-court decision applied clearly established federal

law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Williams v.

Taylor*, 529 U.S. 362, 411 (2000). "AEDPA thus imposes a 'highly deferential standard for

evaluating state-court rulings,' *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997), and 'demands

that state-court decisions be given the benefit of the doubt,' *Woodford v. Visciotti*, 537 U.S. 19,

24 (2002) (*per curiam*)." *Renico v. Lett*, 559 U.S. 766, 773 (2010).

"A state court's determination that a claim lacks merit precludes federal habeas relief so

long as 'fairminded jurists could disagree' on the correctness of the state court's decision."

*Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). To obtain

a writ of habeas corpus from a federal court, a state prisoner must show that the state court's

ruling on his or her claim "was so lacking in justification that there was an error well understood

and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at

103.

A state court's determination of a factual issue is presumed to be correct unless the petitioner rebuts the presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Holland v. Rivard*, 800 F.3d 224, 242 (6th Cir. 2015), *cert. denied*, 136 S. Ct. 1384 (2016). In addition, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

### III.

### A.

Petitioner alleges that the prosecutor deprived him of due process and a fair trial by failing to disclose the search warrant that was executed on Petitioner's vehicle. Petitioner contends that the warrant constituted favorable evidence because his defense was that he was incorrectly identified by the complaining witnesses and that his DNA evidence was recovered from somewhere other than at the crime scene. According to Petitioner, trial counsel's attempt to create doubt regarding the origin of the DNA evidence would have been significantly enhanced if the search warrant had been disclosed. The Michigan Court of Appeals adjudicated Petitioner's claim on the merits and concluded that Petitioner had failed to establish a violation of his right to due process.

### 1.

The Supreme Court has held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). There are three components to a *Brady* claim: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and

prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). "[E]vidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id*. at 280 (quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985)).

**2.**

Petitioner's *Brady* claim fails for several reasons. First, the warrant itself was not favorable evidence. It merely authorized the police to search a light green 1997 Buick LaSabre registered to Petitioner. *See* Petitioner's motion for new trial and supporting brief, Ex. D, ECF No. 6-13, Page ID 678. And Officer Sturley testified about his attempt to search the vehicle. Although the return attached to the warrant indicates that a different officer actually searched Petitioner's vehicle, the return reads: "Nothing Taken." *Id*., Page ID 679. If anything, the affidavit and return would have bolstered the prosecution's case that the sample of blood used during the DNA analysis was taken from the pizzeria, not Petitioner's vehicle.

Second, "*Brady* does not apply to information that is not wholly within the control of the prosecution." *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998). Although Petitioner alleges that he did not have access to the warrant, he maintained at the hearing on his motion for new trial that defense counsel would have discovered the search warrant himself if he had conducted an independent investigation. 3/9/12 Mot. Hr'g at 13, ECF No. 6-12, Page ID 511. And the Michigan Court of Appeals pointed out on review of Petitioner's claim that defense counsel knew from speaking with Petitioner's acquaintances that Petitioner drove the car after he was shot and, therefore, he could have found the car and discovered the warrant which, according to Petitioner, was inside the car. *Burks*, 2013 WL 1500976, at *1; *see also* Petitioner's memorandum of law in support of his habeas petition, at 30, ECF No. 1, Page ID 49 (indicating

that Petitioner's brother Darius Burks found the search warrant in Petitioner's vehicle when he retrieved the vehicle from the towing facility). There is no *Brady* violation when, as here, "a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available . . . from another source, because in such cases there is really nothing for the government to disclose." *Coe*, 161 F.3d at 344 (internal quotation marks and end citations omitted).

Finally, no prejudice resulted from the failure to disclose the warrant because, as noted above, a police officer executed the search warrant on February 26, 2011, and reported that nothing was taken from the vehicle. ECF No. 6-13, Page ID 679. Thus, the affidavit and return would not have helped Petitioner establish that the police took a sample of his blood from somewhere other than at the scene of the attempted robbery.

Furthermore, as explained by the Michigan Court of Appeals,

> the search warrant did not change the prosecution's established chain of custody. The prosecution presented evidence from the evidence and laboratory technicians matching the evidence tag numbers for the blood DNA collected at the scene and tested in the Michigan State Police laboratory.

*Burks*, 2013 WL 1500976, at *2.

The Michigan Court of Appeals reasonably concluded that Petitioner failed to establish a *Brady* violation. Petitioner, therefore, has no right to habeas relief on the basis of his claim.

**B.**

Petitioner's remaining four claims allege ineffective assistance of trial counsel. The Michigan Court of Appeals considered and rejected each of Petitioner's claims about trial counsel.

The "clearly established federal law" for Petitioner's claims is *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, Petitioner must demonstrate "that counsel's performance

was deficient" and "that the deficient performance prejudiced the defense." *Id*. at 687. "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id.*

The first prong of this test requires showing "that counsel's representation fell below an objective standard of reasonableness." *Id*. at 688. A defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687.

The second prong "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. A defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. "This does not require a showing that counsel's actions 'more likely than not altered the outcome,'" but "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 111–12 (quoting *Strickland*, 466 U.S. at 693). In a habeas case, moreover, review of an ineffective-assistance-of-counsel claim

> is "doubly deferential," *Cullen v. Pinholster*, 563 U.S. 170, 190, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011), because counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," *Burt v. Titlow*, 571 U.S. ——, ——, 134 S.Ct. 10, 17, 187 L.Ed.2d 348 (2013) (quoting *Strickland v. Washington,* 466 U.S. 668, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); internal quotation marks omitted). In such circumstances, federal courts are to afford "both the state court and the defense attorney the benefit of the doubt." *Burt, supra*, supra, at ——, 134 S.Ct., at 13.

*Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) (*per curiam*).

### 1.

Petitioner alleges that his trial attorney should have asked the trial court for a hearing on whether the complainants' in-court identifications of him should be suppressed. Petitioner

contends that the photographic show-ups conducted by the police were suggestive and that there was not an independent basis for the in-court identifications. Both the trial court and the Michigan Court of Appeals opined on review of Petitioner's claim that a motion to suppress the in-court identifications would have been futile and that defense counsel was not required to make a futile motion.

### i.

An identification procedure violates due process of law if the confrontation was "'unnecessarily suggestive and conducive to irreparable mistaken identification.'" *Neil v. Biggers*, 409 U.S. 188, 196 (1972) (quoting *Stovall v. Denno*, 388 U.S. 293, 302 (1967)). "[C]onvictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968).

### ii.

Petitioner alleges that the pretrial identification procedure in his case was suggestive because a police officer informed Mr. Policchio at the photographic show-up that the police had made an arrest in the case. 8/10/11 Trial Tr. at 24-25, ECF No. 6-8, Page ID 321-22. But suggesting to a witness that a suspect is in the photo array does not necessarily render the procedure unduly suggestive, particularly when, as here, the witness unequivocally identified the suspect and was not told which photograph depicted the suspect. *United States v. Porter,* 29 F. App'x 232, 237 (6th Cir. 2002). A pretrial procedure is impermissibly suggestive if it "made it all but inevitable that [the witness] would identify petitioner whether or not he was in fact 'the man,'" *Foster v. California*, 394 U.S. 440, 443 (1969), or if the police steered the witness to the

petitioner's photograph, independent of the witness's "honest recollection." *Cornwell v. Bradshaw*, 559 F.3d 398, 413 (6th Cir. 2009). The record does not show that this happened in Petitioner's case. Therefore, the officer's comment that the police had made an arrest in the case did not render the procedure unduly or impermissibly suggestive.

Petitioner also alleges that the pretrial identification procedure was suggestive because it depicted him with very dark skin even though he has light skin. But this was to Petitioner's advantage, because Mr. Flores described the suspect to the police as light-skinned. 8/10/11 Trial Tr. at 39, ECF No. 6-8, Page ID 336. Furthermore, Mr. Flores did not identify Petitioner in the array, and he admitted at trial that, when he viewed the array, he thought the person in position number four might be the suspect. *Id.* at 40, Page ID 337. The fact that he was unable to identify Petitioner in the array undermines Petitioner's argument that the pretrial procedure was impermissibly suggestive. *See Millender v. Adams*, 376 F.3d 520, 525 (6th Cir. 2004) (concluding that a lineup was not impermissibly suggestive where only three of the six victims identified the petitioner in the lineup). Mr. Flores' failure to identify Petitioner during the photographic show-up "went to the credibility of his in-court identifications, not their admissibility." *Id.*

As for Mr. Policchio, he did not mention anything about the suspect's complexion on the day of the crime. 8/10/11 Trial Tr. at 31-32, ECF No. 6-8, Page ID 328-29. Unless "a witness described the distinctive characteristic to the police beforehand, that characteristic is not a basis for finding a lineup unduly suggestive." *Howard v. Bouchard*, 405 F.3d 459, 471 (6th Cir. 2005).

Thus, the photographic show-ups were not impermissibly suggestive. Therefore, trial counsel's failure to seek a hearing for the purpose of challenging the witnesses' in-court identifications did not rise to the level of deficient performance. A suppression motion would

have been futile, and "failing to make a futile motion is neither unreasonable nor prejudicial." *Jacobs v. Sherman*, 301 F. App'x 463, 470 (6th Cir. 2008) (citing *Strickland*, 466 U.S. at 687).

Furthermore, trial counsel's cross-examination of the eyewitnesses provided the jury with an adequate opportunity to assess the reliability of their identifications of Petitioner. It is not ineffective assistance to challenge a witness's identification of a suspect at trial, rather than in a preliminary motion. *Sanders v. Curtin*, 529 F. App'x 506, 520 (6th Cir. 2013).

### iii.

Even if trial counsel's performance was deficient, there was an independent basis for the eyewitnesses' testimony. The factors to be considered when making this evaluation are:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Biggers*, 409 U.S. at 199-200.

Applying these factors here, the Court notes that Mr. Policchio viewed the suspect for a few seconds from twelve to eighteen feet away, and nothing impeded his ability to see the person. He apparently was paying attention because he claimed that he heard the door open and then saw the suspect come inside the pizzeria with a gun that he pointed at Mr. Flores. Petitioner does not disagree with Mr. Policchio's prior description of him as being a black male in his twenties, about six feet, one inch tall, with an average build. Additionally, Mr. Policchio appears to have been certain of his identification during the photographic show-up, and the show-up occurred only four days after the attempted robbery. 8/10/11 Trial Tr. at 9–32, ECF No. 6-8, Page ID 306–29.

As for Mr. Flores, he was even closer to the suspect than Mr. Policchio, and he claimed at trial that he was facing the suspect the entire time. *Id.* at 44, 48, Page ID 342, 345. He kept

staring at the suspect's gun and he feared being shot and killed, *id*. at 45, Page ID 342, but this is an indication that he was focused on what was happening. *See United States v. Meyer*, 359 F.3d 820, 826 (6th Cir. 2004) (concluding in a case where the eyewitness spoke with the armed robber and had an excellent opportunity to view the robber that a witness's "concern for his safety did not distract his attention; if anything, it heightened his degree of attention").

Petitioner does not dispute the accuracy of Mr. Flores' description of him as a light-skinned black man with a mustache and goatee and about six feet, two inches tall. 8/10/11 Trial Tr. at 38–39, ECF No. 6-8, Page ID 335–36. And even though the preliminary examination was a suggestive setting for an identification, Mr. Flores indicated at trial that he was able to identify Petitioner at the preliminary examination because he recognized his face. *Id*. at 41, 43, Page ID 338, 340. He denied identifying Petitioner simply because Petitioner was seated in court. *Id*. at 50, Page ID 347.

In short, the Michigan Court of Appeal's rejection of Petitioner's challenge to the in-court identifications of Petitioner was reasonable, and Petitioner has no right to habeas relief on the basis of his claim.

## 2.

Petitioner alleges next that trial counsel was ineffective for failing to conduct an adequate investigation and seek discovery of any and all search warrants executed by the police on his property. Petitioner asserts that, if counsel had been aware of the search warrant executed on Petitioner's vehicle, the warrant could have been utilized to suggest that his DNA was found in his car, rather than at the scene of the attempted robbery. According to Petitioner, knowledge that a search warrant was actually executed on the vehicle could have bolstered his defense.

The Michigan Court of Appeals concluded on review of this claim that defense counsel's performance was deficient, but that the deficient performance did not prejudice the defense. This Court agrees that the allegedly deficient performance did not prejudice Petitioner, because (1) the return on the warrant indicated that nothing was taken during a search of Petitioner's car and (2) the prosecution established a credible chain of custody for the blood extracted from the wall of the pizzeria and the sidewalk outside the pizzeria. Thus, even if trial counsel could have shown that the police actually searched Petitioner's car, there is not a reasonable probability that the jury would have concluded that the police acquired Petitioner's blood sample from his car and not from the crime scene. The Michigan Court of Appeals reasonably concluded that trial counsel's performance was not prejudicial, and because Petitioner has not established both prongs of the *Strickland* test, he is not entitled to relief on the basis of his claim.

**3.**

In his third claim about trial counsel, Petitioner contends that defense counsel failed to fully investigate exculpatory witnesses and produce the witnesses at trial. The Michigan Court of Appeals concluded on review of Petitioner's claim that the witnesses would not have made a difference in the outcome of the trial and, therefore, Petitioner's attorney was not ineffective for failing to call the witnesses.

**i.**

Defense attorneys have "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. "This duty includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence." *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). An attorney's "failure to conduct a reasonable investigation into . . . 'a known and

potentially important witness' violate[s] [a defendant's] Sixth Amendment right to the effective assistance of counsel." *Id.* at 259 (quoting *Blackburn v. Foltz*, 828 F.2d 1177, 1183 (6th Cir. 1987)).

"The failure to call favorable witnesses can amount to ineffective assistance where it results in prejudice to the defense," *Pillette v. Berghuis*, 408 F. App'x 873, 884 (6th Cir. 2010), but the Court "must presume that decisions of what evidence to present and whether to call or question witnesses are matters of trial strategy." *Cathron v. Jones*, 77 F. App'x 835, 841 (6th Cir. 2003) (citing *Hutchison v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002)). "A defense counsel has no obligation to call or even interview a witness whose testimony would not have exculpated the defendant." *Millender*, 376 F.3d. at 527 (quoting *Millender v. Adams*, 187 F. Supp.2d 852, 877 (E.D. Mich. 2002) (citing *Marra v. Larkins*, 111 F. Supp. 2d 575, 585 n. 13 (E.D. Pa. 2000)).

**ii.**

Petitioner has not named any witnesses that his attorney should have called, but he presented three affidavits in support of his claim in state court. Toya Kimbrough and Mary Fortune state in similar affidavits that they took Petitioner to Oakwood Hospital in Dearborn, Michigan on February 19, 2011, and that on the way to the hospital Petitioner said he had been shot while trying to purchase marijuana. Ms. Kimbrough and Ms. Fortune further assert in their affidavits that they informed Petitioner's attorney of what they witnessed on February 19, 2011, but they never spoke with him again. *See* Petitioner's Motion to Remand, App. B, ECF No. 6-13, Page ID 586–91.

The third affidavit is from Stephany Gerst who states that she arrived at Oakwood Hospital about 11:30 p.m. on February 19, 2011. Petitioner was wearing a hospital gown at the time, and on the following morning, a nurse handed her a paper bag with Petitioner's clothing in

it. A note on the bag indicated that the Detroit Police Department did not need the clothing for evidence. Continuing, Ms. Gerst asserts in her affidavit that the jeans Petitioner was wearing on the night of the shooting had bullet holes and significant blood stains on them and that Petitioner told her he had gotten into an altercation with some people. Ms. Gerst also asserts in the affidavit that she informed Petitioner's attorney about Petitioner's clothing, but the attorney urged her to tell Petitioner to plead guilty and forego a trial. *Id.*, Page ID 592–93.

The women's affidavits and Petitioner's own allegations indicate that trial counsel was aware of the witnesses and had at least some contact with them. The question then is whether trial counsel was ineffective for failing to call the women as witnesses at Petitioner's trial. Petitioner claims that the witnesses could have testified about his clothing or explained how he sustained his injuries on the night of the robbery. None of the three witnesses, however, claim to have been present when Petitioner was shot, and both the state trial court and the Michigan Court of Appeals opined that the witnesses' explanation of Petitioner's gunshot wounds would have been inadmissible hearsay. The state courts' interpretation of state law binds this Court. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005). Even if Ms. Kimbrough and Ms. Fortune would have been permitted to testify about what Petitioner said to them, the prosecutor likely would have attempted to impeach them with the fact that, when the police stopped and questioned them at the hospital, they told the police that they did not know how Petitioner was shot. *See* Petitioner's motion to remand, App. B, ECF No. 6-13, Page ID 587 and 590.

As for Ms. Gerst's averments regarding Petitioner's clothes, this evidence would have been somewhat beneficial to Petitioner's theory of misidentification because Mr. Flores described Petitioner as wearing jogging pants, not jeans, during the attempted robbery. 8/10/11 Trial Tr. at 51, ECF No. 6-8, Page ID 348. But the pants were not critical evidence in the case; it

was the suspect's face that Mr. Policchio picked out in the photographic array and that both eyewitnesses recognized when they saw him in court.

Additionally, as the Michigan Court of Appeals pointed out on review of Petitioner's claim, the prosecution's case was strong, and for the result of the proceeding to be different, the jury would have had to find that the DNA test results, the eyewitnesses' testimony, and Petitioner's admission at the hospital with gunshot wounds shortly after the crime was unreliable evidence. The jury also would have had to believe that Petitioner told the three women the truth and that they were telling the truth in their affidavits or testimony. The Court of Appeals opined that this outcome was highly unlikely and that defense counsel was not ineffective for failing to call the women as witnesses because they would not have made a difference in the outcome of the trial.

This Court agrees there is not a substantial probability that the outcome of the trial would have been different if trial counsel had called Ms. Kimbrough, Ms. Fortune, and Ms. Gerst as witnesses. Therefore, trial counsel was not ineffective for failing to produce the women as defense witnesses at Petitioner's trial.

**4.**

In his fourth and final claim regarding trial counsel, Petitioner alleges that his attorney should have made a timely motion to adjourn the trial so that a bullet lodged in Petitioner's back could be removed and compared to the gun used by Mr. Flores to shoot the robber. Petitioner speculates that the caliber of the bullet would not match Mr. Flores' gun and, therefore, the bullet would have provided strong exculpatory evidence. Petitioner maintains that counsel's failure to move for an adjournment constituted deficient performance and that the deficient performance prejudiced his ability to present a complete defense. The Michigan Court of Appeals disagreed

and concluded that "it was reasonable trial strategy for defense counsel to fail to request that the bullet be removed." *Burks*, 2103 WL 1500976, at *5.

Petitioner himself moved for an adjournment on the first day of trial. Defense counsel assisted Petitioner in bringing his oral motion, but he took no position on the issue. He left the matter to the trial judge, who denied the motion because the bullet had been in Petitioner's back while he was in custody and because Petitioner made his request thirty seconds before the start of the trial. 8/10/11 Trial Tr. at 6–8, ECF No. 6-7, Page ID 206–08.

Petitioner contends that trial court's focus on the timing of his oral motion indicates that the court may have evaluated his motion in a different light had defense counsel brought the motion within the prescribed time for bringing pre-trial motions. But even if trial counsel had made a timely and successful motion to adjourn the trial, Petitioner merely speculates that the bullet in his body would not have matched Mr. Flores' gun. A defense attorney's failure to pursue a defendant's purely speculative claim does not fall below an objective standard of reasonableness. *United States v. Burwell*, 83 F. Supp. 3d 6, 12 (D. D.C. 2015); *see also Jackson v. Bradshaw*, 681 F.3d 753, 764 (6th Cir. 2012) (concluding that trial counsel did not act unreasonably in declining to pursue more thoroughly a witness's bias against the petitioner where counsel did raise the issue and pursued other lines of defense and where "the effect of further probing [was] so speculative").

Also, given the strength of the prosecution's case, there is a strong possibility that the bullet in Petitioner's body would have matched Mr. Flores' gun and proved to be inculpatory, not exculpatory, evidence. Therefore, defense counsel's failure to seek an adjournment of the trial for the purpose of enabling surgeons to remove the bullet from Petitioner's body did not amount to deficient performance. It appears to have been reasonable trial strategy.

The Michigan Court of Appeals' adjudication of Petitioner's claims about trial counsel was not contrary to, or an unreasonable application of, *Strickland*. Habeas relief, therefore, is not warranted on Petitioner's ineffective-assistance-of-counsel claims.

## IV.

For the reasons given in this opinion, the state courts' decisions in Petitioner's case were not "so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. Thus, the petition for a writ of habeas corpus will be denied.

To obtain a certificate of appealability, a prisoner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). When, as here, a district court rejects a habeas petitioner's constitutional claims on the merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id*. at 484. A federal district court may grant or deny a certificate of appealability when the court issues a ruling on the habeas petition. *Castro v. United States*, 310 F.3d 900, 901 (6th Cir. 2002).

Here, "[t]he Court will deny [P]etitioner a certificate of appealability because he has failed to make a substantial showing of the denial of a federal constitutional right." *Dell v. Straub*, 194 F. Supp.2d 629, 659 (E.D. Mich. 2002). The Court nevertheless will grant Petitioner leave to proceed *in forma pauperis* on appeal because an appeal could be taken in good faith. 28 U.S.C. § 1915(a)(3). *See* Walker v. O'Brien, 216 F.3d 626, 631–32 (7th Cir. 2000) (explaining

that the standard governing issuance of a certificate of appealability is more demanding than the standard for determining whether appeal could be made in good faith).

**V.**

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus, ECF No. 1 is **DENIED and DISMISSED with prejudice**.

It is further **ORDERED** that a certificate of appealability is **DENIED**.

It is further **ORDERED** that leave to proceed *in forma pauperis* on appeal is **GRANTED**.

Dated: September 15, 2017                                    s/Thomas L. Ludington
                                                            THOMAS L. LUDINGTON
                                                            United States District Judge

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 15, 2017.

s/Kelly Winslow
KELLY WINSLOW, Case Manager